IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 25, 2005

## STATE OF TENNESSEE v. DOUGLAS F. JORDAN, JR.

**Appeal from the Circuit Court for Blount County**
**No. C-11261      D. Kelly Thomas, Jr., Judge**

————————

**No. E2003-02159-CCA-R3-CD - Filed May 17, 2005**

————————

The defendant, Douglas F. Jordan, Jr., was convicted of second degree murder and ordered to serve twenty-three years in the Department of Correction. In this appeal of right, the defendant contends that the evidence was insufficient, that the trial court committed certain evidentiary errors, that the trial court erred by denying his motion for continuance, and that the sentence was excessive. The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

J. Liddell Kirk (on appeal and at trial) and M. Jeffrey Whitt (at trial), Knoxville, Tennessee, for the appellant, Douglas F. Jordan, Jr.

Paul G. Summers, Attorney General & Reporter; Renee W. Turner, Assistant Attorney General; and James Brooks, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

On March 11, 1998, the victim, Jennifer Byerley, who was deaf and mute, was at the End Zone bar on Alcoa Highway near the Knoxville airport. An employee at the bar, Mary Roberts, who was a neighbor to the victim, saw that the victim had been "talking to the Mexicans," who frequented the bar, and, because she felt the men were acting "inappropriate[ly]" toward the victim, she asked them to leave. The victim, who was crying, stayed in a booth. The defendant, whom Ms. Roberts had seen in the bar several times previously, asked about the victim and then obtained a paper and pencil (so as to be able to communicate) before going to sit with her in the booth. Ms. Roberts saw the two pass notes before the defendant stood, wadded the paper, threw it in a trash can, and remarked, "[H]ow in the hell did I get my [self] into this sh*t[?]" Ms. Roberts recalled that the defendant, who at that time had no physical blemishes other than a "place" on his nose, then went to the restroom. It was her recollection that the defendant left the bar through a back door at about

11:30 p.m. and the victim left later through the front door. Ms. Roberts remembered that when she saw the defendant the next day, he had "a lot of scratches" down the side of his face.

At approximately 6:30 a.m. on March 12, the body of the victim was discovered in a curve along the side of Wheeler Road in Blount County about 1.2 miles from the End Zone and less than ½ mile from the victim's apartment. The victim was on her back. One leg was crooked and one arm of her jacket was pulled over her head and face. Her throat was cut. There was blood on the victim's jacket and frost on the sleeve. The victim was wearing three rings.

At trial, Ms. Roberts acknowledged that during the two years the victim had been a patron of the End Zone, she had "pretty much exclusively . . . hung around Mexicans." Although she initially denied having prevented the victim from leaving with "the Mexicans" on the night of her death, Ms. Roberts acknowledged having told police she had done so. She also admitted having told police that "the Mexicans" left the bar at 11:30 p.m., only minutes before the defendant had departed. Finally, she also admitted that during her statement to police, which was provided before she saw the defendant on the day the body was discovered, she described his physical appearance as follows: "He's got light brown hair and he's just been in a wreck so he's got a scar on his nose and skinned – you know, skinned up all over. He just had a wreck, like last week."

Earl Horton, a bartender at the End Zone who knew the victim and the defendant as patrons of the bar, testified that sometime between midnight and 1:00 a.m., the victim and the defendant "had a discussion" after which the defendant left quickly through the back door and the victim seemed upset. He testified that when the victim left through the front door, he followed her outside and asked whether she was "okay." Because he was concerned for her safety, he walked to the edge of the building to watch her progress. He saw that the defendant was waiting outside of the building and when the victim walked up to him, Horton asked if they were "okay." The defendant replied, "[Y]es, we're fine." The victim nodded her head affirmatively and the two walked away in the direction of the motel next door. When Horton saw the defendant two days later, he noticed some scratches on the left side of his face and hands that he had not seen before. After being asked about the scratches, the defendant explained that he had scratched himself because of a skin condition.

Martha Gaston, who worked at The Laundry Place on Chapman Highway in Knoxville, testified that at approximately 3:00 p.m. on the afternoon after the murder, the defendant brought some laundry in to be washed. He offered to pay extra for same-day pick-up and she agreed. Ms. Gaston recalled that the defendant "looked sweaty" and that he explained that he had "had an accident." She remembered that the defendant pointed out blood on the sheets and that she thought it was unusual because it was "red and deep," as opposed to menstrual blood. Although she used bleach on the sheets, Ms. Gaston was unable to remove the blood stains. She testified that the defendant picked up his laundry between 5:00 and 6:00 p.m.

Blount County Sheriff's Department Detective Scott Carpenter, who executed a search warrant at the victim's apartment, found no signs of any struggle. Officers also searched the defendant's residence, a second-floor motel room at the Airport Inn, and found a crumpled note in

the garbage can under the sink. According to Detective Carpenter, you could "throw a rock from the back of the End Zone and hit the Airport Inn." He testified that while officers also seized bloody sheets, subsequent testing established the blood was that of the defendant. In an interview by Detective Carpenter on the day after the murder, the defendant, who is right-handed, stated that he met the victim four or five nights earlier while playing pool at the End Zone. He explained to the officer that because the victim was deaf and mute, they communicated by writing notes and that the victim asked for his address after their initial meeting and visited his residence later that night. According to the defendant, they communicated in writing for about thirty minutes and he drove her home. He stated that on the evening of the murder, he spent most of his time at the bar with a woman named Robin but that later, while he was shooting pool, Mary Roberts asked for someone to help the victim "because . . . people [were] taking advantage of her." He told the officer that in response to the request, he had discouraged the victim from leaving the bar with another man and that after "all of her Mexican friends" had gone, she declined his offer of a ride home. The defendant claimed to the officer that the victim left first and that he finished his beer before leaving through the back door. He initially maintained that the occasion was the last time he had seen the victim but, later, when confronted with a note police had found in his trash can, he admitted that the victim had been in his room that night, contending that she had waited outside the End Zone and followed him home. The defendant explained that he had initially lied to the officer because he was nervous. He insisted that because he was interested only in sex and had refused a romantic relationship with the victim, she left his residence after approximately fifteen minutes. The note, which the defendant helped the officer read, provided as follows:

> [Victim]        I'm so sorry[.] I not mean[]. I'm so drunk.
> [Defendant]   You make me look like a fool and me want nothing to do with you[.] I want you to go home. I told you I did not want you for g[ir]lfriend and that's what I meant[.] I just want to be free and have fun [period.] If the[re] were any chance of us you just ruined it. Do you want me to take you home[?]
> [Victim]        Can I stay with you tonight? Did you stop by my house . . . after you[r] work?
> [Defendant]   No! I did not stop by your house.
> [Victim]        Do you want me to go home?
> [Defendant]   Yes [and] no[.] I don't want you to be close to me!!!!!!! I do not want you as girlfriend[.] Just for fun! Do you want to go home or do you want to stay here and f**k[?]

When questioned about blood that was found around his bathroom sink, the defendant told the officer that he had been injured in a car accident five days earlier. He denied having had sex with the victim and denied having killed her. He agreed to provide police with blood and hair samples and consented to have his car impounded for examination. When asked to account for his time since the murder, the defendant reported to the officer that he had performed a variety of personal errands, which included taking his laundry to The Laundry Place on Chapman Highway.

In an interview five days later on March 17, the defendant acknowledged that he was angry with the victim on the night of the murder because they "had to have the same conversation again" and "she couldn't take no for an answer." He denied, however, that he had been angry enough to kill the victim and further denied having hit her or harmed her in any way. When asked about the blood on his sheets, the defendant explained that he had a skin condition that caused him to become injured and bleed easily. In a final interview on August 27, the defendant continued to deny having had any physical contact with the victim, even when the officer falsely advised him that the victim's blood had been identified on his sheets. He insisted that the DNA results were error, stating, "Something ain't right. . . . They's got to be something somewhere somebody ain't seeing." The defendant asked the officer, "Ain't they something else you all can do to check further than you have? I know that it might cost the taxpayers a lot of money but I pay my taxes too." During cross-examination, Detective Carpenter acknowledged that the defendant cooperated fully with the police in their investigation.

There were stipulations of fact:

1.      [The defendant's] blood was on the side of his motor vehicle . . . [and] was found on the console inside of the same vehicle; no other person's blood was found in or on the vehicle.
2.      [The defendant's] and [the victim's] blood [were] found mixed on the right front of the [victim's] black corduroy overalls . . . [and] on the rear tag on the inside of the [victim's] bra.
3.      [The defendant's] blood was found on the sheets [seized by officers at the defendant's residence].
4.      [The defendant's] blood was found on the note [seized by officers at the defendant's residence].
5.      The defendant's DNA was found under the index and ring finger nail scrapings of [the victim's] right hand.
6.      [The victim's] blood was found only on her person and the clothes she was wearing.

Deanna Jordan, who was married to the defendant's father at the time of the murder, testified that the defendant arrived at their residence a day or two after the murder "noticeably on drugs." She described him as crying, unshaven, and appearing nervous. Ms. Jordan recalled that when he approached the back porch where she and her husband were sitting, the defendant announced that "he had done something awful." She understood him to say that he had "shot up [illegal drugs] fourteen times that day." When Ms. Jordan asked him, "Is that how that happened," he replied in the affirmative. She then excused herself to make coffee while her husband and the defendant spoke. During cross-examination, Ms. Jordan acknowledged that she did not hear the defendant make any specific reference to killing the victim. The defendant's father died shortly after the victim's murder.

Megan Clement, the Technical Director of the Forensic Identity Testing Department of LabCorp, performed DNA testing on certain items of evidence. She testified that the victim's blood

-4-

was not found on the defendant's sheets, but that when bleach is used, it can "degrade DNA and break it down to the point where it's undetectable." Ms. Clement related that she only tested scrapings from two of the five fingers on the victim's right hand, but recalled that the testing yielded a mixture of DNA consistent with the victim and the defendant. She acknowledged that she was unable to identify the origin of the defendant's DNA as skin, blood, or saliva.

Dr. David M. Gilliam, who performed the autopsy, estimated that the victim had been dead for three to five hours when the body was found. He testified that although the victim's throat had been cut, the cause of death was manual strangulation. The victim also had blunt force injuries to the head and face and a non-lethal stab wound to the upper right abdomen which Dr. Gilliam believed, based on bleeding and bruising patterns, to have occurred prior to death. Dr. Gilliam characterized the victim's neck wound as "gaping" and described it as "consistent with someone being on top of, kneeling over, or sitting on top of the victim and cutting from the victim's right to left." It was his opinion that a right-handed person inflicted the neck injuries. During the testimony of Dr. Gilliam, the state introduced the following photographs of the body made at the time of autopsy:

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 27 | two 8"x12" color glossy photographs mounted on foamboard<br>A – close-up of face (eyes open) and neck, with focus on lips<br>B – close-up of injuries around right eye |
| 28 | three 8"x12" color glossy photographs mounted on foamboard close-ups of inner surface of scalp and cranial bones after outer scalp has been "flip[ped] back . . . with the hair" |
| 29 | two 8"x12" color glossy photographs mounted on foamboard extreme close-ups of neck wounds, with what appears to be severed trachea[1] |

---

[1]Although there was no objection to the introduction of these photographs at trial, the trial court called a recess immediately after the introduction of this exhibit, commenting as follows: "This is awfully gruesome. . . . One of the jurors on the front row looked like he was about ready to fall out." While this issue has not been raised on appeal, the admission of graphic photographs with little or no probative value may qualify as prejudicial error. See, e.g., State v. Collins, 986 S.W.2d 13, 21 (Tenn. Crim. App. 1998). This court has suggested guidelines:

Photographs made during or after an autopsy should be scrutinized and examined prior to being shown to the jury. Dubose, slip op. at 20; see generally State v. McCall, 698 S.W.2d 643 (Tenn. Crim. App.1985). If other considerations substantially outweigh the probative value of the evidence, it should be excluded. In State v. Banks, 564 S.W.2d 947, 951 (Tenn.1978), our supreme court recognized "the inherently prejudicial character of photographic depictions of a murder victim. . . ." In adopting Federal Rule of Evidence 403 as its test for admissibility, the court suggested a variety of factors for consideration by the trial judge. The "value of photographs as evidence, . . . their accuracy and clarity . . . whether they were taken before the corpse was moved . . . [and] the inadequacy of the

(continued...)

-5-

| | |
|---|---|
| 30 | two 8"x12" color glossy photographs mounted on foamboard extreme close-ups of abdominal wounds |

Sandra Scott, who testified on behalf of the defense, recalled that two days before the murder, she had lunch with the defendant and her best friend, Shawna Jordan, who was dating the defendant. Ms. Scott contended that the defendant "had scars all over his face and his nose and scars on his body." She recalled that when she asked what had happened, he answered that he had wrecked his car.

Carl Anderson, a life-long friend of the defendant, testified that he also saw the defendant shortly after the car accident in March. Although he could not recall the date, Anderson claimed that he had arrived at the residence of the defendant's father just after a tow truck had unloaded the defendant's wrecked vehicle. He described the defendant as "[c]ut up . . . and scuffed up pretty bad."

Mike Michaels, the defendant's stepfather, testified that the defendant telephoned him at approximately 4:30 a.m. on March 8 to request assistance after an automobile accident. He recalled that he picked the defendant up at his residence at the Airport Inn and drove to the scene of the accident on Maloney Road. According to Michaels, the defendant had lost control of his vehicle, gone over a twelve-foot embankment, and struck a tree. Michaels recalled that the defendant had a number of cuts and bruises, including some on the face. He testified that he and the defendant's mother helped clean and dress the wounds, remembering that they "pulled glass out of [the defendant's] head for about an hour."

Sharon Monterrosol testified that she first met the victim at the residence of a friend the November prior to her murder. She recalled that the victim, who was with her boyfriend, Marco Villo-Gomez, had a black eye. Ms. Monterrosol stated that at some point after Christmas 1997, some two months before the murder, she overheard Villo-Gomez say that he was going to kill "her." She acknowledged that he did not identify the victim by name and that he "had been drinking and . . . was angry" at the time of the remark. Ms. Monterrosol testified that some time later, she again overheard Villo-Gomez, whom she described as "very drunk" and "very angry," say in Spanish that he was "going to kill the bitch." During cross-examination, she acknowledged that Villo-Gomez appeared to care about the victim and was "very protective" of her. Ms. Monterrosol stated that in March of 1998, Villo-Gomez lived in Morristown but would sometimes visit on weekends, staying with relatives in the victim's apartment complex. She testified that he was left-handed.

---

[1](...continued)

testimonial evidence in relating the facts to the jury" are appropriate factors. Id.

\* \* \*

As a general rule, where medical testimony adequately describes the degree or extent of an injury, gruesome and graphic photographs should not be admitted. See State v. Duncan, 698 S.W.2d 63, 69 (Tenn. 1985). . . .

Id. at 19-21.

David Cockrill, the victim's next door neighbor at the time of her death, testified that the victim "would come over and knock on [his] door from time to time and hand [him] notes wanting to borrow money" but that, otherwise, she generally frequented with "the Mexicans," who lived in the apartment complex. He stated that the victim was unemployed and received a Social Security disability check every month but that she would often use her money to purchase beer and cigarettes for the Mexicans. According to Cockrill, he last saw the victim on the morning prior to her death when they were leaving their respective apartments. He recalled that he went to bed at about 11:15 that evening before being awakened at approximately 3:00 a.m. by a "disturbance" at the victim's apartment. Cockrill described overhearing a male voice shouting angrily in Spanish, which he could not understand. He could also hear the victim grunting, which "was about the only noise she could make." Cockrill claimed that on the next day he told police about the event, which he estimated to have lasted for about five minutes.

Before resting its case, the defense also introduced documents concerning an April 9, 1998, plea of guilt by Marco Villo-Gomez to a charge of assault involving the victim. The warrant completed by the victim provided as follows:

> [The victim] states that on [October 16, 1997] while at her own residence she and [Villo-Gomez] became engaged in an argument when without prov[o]cation [Villo-Gomez] struck [the victim] several times about the arms and chest in a knowing, intentional, and reckless manner. . . .

The judgment reflected that Villo-Gomez received a sentence of eleven months, twenty-nine days.

In rebuttal, the state put on the testimony of Gladys Horton, the manager of the victim's apartment complex. She testified that after the victim's death, she questioned a number of the tenants, including David Cockrill, none of whom reported having heard anything unusual that evening.

The defense then recalled David Cockrill, who denied having been questioned by Ms. Horton.

Rhonda Gillespie, who characterized the victim as her "best friend," testified as the state's final rebuttal witness. She stated that the victim and Villo-Gomez ended their romantic relationship at the beginning of December 1997, and that she had not seen Villo-Gomez since that time.

I

Initially, the defendant argues that the evidence, all circumstantial, is insufficient to support his identity as the victim's killer. The state contends otherwise.

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835

(Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

A criminal offense may be established exclusively by circumstantial evidence. Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 203 Tenn. 440, 313 S.W.2d 451, 456-58 (1958); State v. Hailey, 658 S.W.2d 547, 552 (Tenn. Crim. App. 1983). If entirely circumstantial, the facts and circumstances must "be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." State v. Crawford, 225 Tenn. 478, 470 S.W.2d 610, 612 (1971). In such an event, the circumstantial evidence must be both consistent with guilt and inconsistent with innocence. Pruitt v. State, 460 S.W.2d 385, 390 (Tenn. Crim. App. 1970). The weight of the circumstantial evidence is for the jury to determine. Williams v. State, 520 S.W.2d 371, 374 (Tenn. Crim. App. 1974) (citing Patterson v. State, 4 Tenn. Crim. App. 657, 475 S.W.2d 201 (1971)). The court may not substitute its inferences for those drawn by the trier of fact in circumstantial evidence cases. Liakas, 286 S.W.2d at 859; Farmer v. State, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). The same standard of review is applicable whether the guilty verdict was based upon direct evidence or upon circumstantial evidence. State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 208 Tenn. 75, 343 S.W.2d 895, 897 (1971).

Second degree murder is "a knowing killing of another." Tenn. Code Ann. § 39-13-210(a). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. §§ 39-11-106(a)(20), 39-11-302(b).

This question is a close one. There is no direct evidence of guilt. The state was unable to produce the murder weapon. Although there was testimony that bleaching could break down DNA identification, the state stipulated that the victim's blood had not been found near either the defendant's residence or vehicle. Through the testimony of David Cockrill, the defense introduced evidence that the victim had returned to her apartment. Cockrill claimed that at 3:00 a.m., he overheard her engaged in a loud dispute with a male who spoke Spanish. There was ample evidence that the victim socialized primarily with "Mexicans" and that she had previously been the victim of an assault by Marco Villo-Gomez. There was no evidence that the defendant spoke Spanish.

Nevertheless, two witnesses, Mary Roberts and Earl Horton, testified that the defendant was the last person seen with the victim the night of her murder. Horton recalled that when the victim left the End Zone, she walked with the defendant in the direction of his motel residence. On the following day they saw scratches on his face they had not seen before the murder. While the defendant initially denied that the victim had been in his room on the evening of her death, he ultimately admitted that she had been there when he was confronted by police with a note recovered from his trash can. The content of the note indicated that the two disagreed on the nature of their relationship. The defendant acknowledged that he was angry with the victim because of her persistence in pursuing a relationship. The defendant's blood was found on the tag of the victim's bra and on the front of her overalls. His DNA was found under her fingernails. The testimony of Gladys Horton contradicted the testimony of David Cockrill. Expert testimony suggested that the murderer was right-handed. While the defendant was right-handed, the proof established that Villo-Gomez was left-handed. While under investigation and under the influence of drugs, he made a statement which could have been interpreted as incriminating. Finally, shortly after the murder, the defendant, apparently "sweaty," paid extra in order to have same-day laundry service on bloody sheets. As was its prerogative, the jury, which saw and heard the evidence firsthand, chose to accredit the testimony of the state's witnesses and disregard the conflicting proof. See State v. Summerall, 926 S.W.2d 272, 275 (Tenn. Crim. App. 1995). In our view, the circumstantial evidence was marginally sufficient to support the conviction.

II

Next, the defendant asserts that the testimony of his stepmother, Deanna Jordan, that he was under the influence of drugs two days after the murder was irrelevant and should have been excluded. The state contends that the testimony was relevant to the issue of identity and that any confusion as to its meaning goes to the weight, not the admissibility, of the testimony.

Relevant evidence is that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable" than it otherwise would be. Tenn. R. Evid. 401. Generally, all relevant evidence is admissible. Tenn. R. Evid. 402. At the discretion of the trial court, however, relevant evidence may be excluded if it presents a danger of unfair prejudice:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Tenn. R. Evid. 403. This court must not reverse the trial court absent an abuse of discretion. See State v. Stout, 46 S.W.3d 689, 700 (Tenn. 2001).

Tennessee Rule of Evidence 404(b) provides as follows:

-9-

Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing inquiry on cross-examination about specific instances of conduct are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the  ruling, and the reasons for admitting the evidence; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).  A fourth prerequisite to admissibility is that the trial court find by clear and convincing evidence that the defendant committed the other crimes or bad acts.  State v. DuBose, 953 S.W.2d 649, 654 (Tenn. 1997).

Rule 404 was patterned in great measure on State v. Parton, 694 S.W.2d 299 (Tenn. 1985), wherein our supreme court ruled that evidence of other crimes is generally inadmissible.  The terms of this rule establish that character evidence cannot be used to prove that a person has a propensity to commit a crime.  Tenn. R. Evid. 404(b); State v. Adkisson, 899 S.W.2d 626 (Tenn. Crim. App. 1994).  Most authorities suggest that trial courts take a "restrictive approach of 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury."  Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[8][e] (4th ed. 2000).  That perhaps best explains the traditional posture of the courts that any testimony of other bad acts by a defendant is not usually admissible when used as substantive evidence of guilt of the crime on trial.  Parton, 694 S.W.2d at 302-03.  In those instances where the other conduct or acts are similar to the crimes on trial, the potential for a prejudicial result increases.  State v. Bordis, 905 S.W.2d 214, 232 (Tenn. Crim. App. 1995).

Unlike the Federal rule barring such evidence, our rule does not specifically enumerate the purposes for which such evidence may be offered.  State v. Gilliland, 22 S.W.3d 266, 271 (Tenn. 2000). The  Advisory Commission specifically omitted such a list so that lawyers and judges would "'use care in identifying the issues to be addressed by the Rule 404(b) evidence.'"  Id. (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 404.6, at 169 n.457 (3d ed. 1995)).  Therefore, in every case in which evidence of other crimes, wrongs, or acts is offered, the trial court should carefully scrutinize the relevance of the evidence and the reasons for which it is being offered.  Id. Although Rule 404(b) does not explicitly list these exceptions, our courts have held that evidence of other crimes may be admissible to show motive, intent, guilty knowledge, identity of the defendant, absence of mistake, and the existence of a common scheme or plan.  See, e.g., Collard v. State, 526 S.W.2d 112, 114 (Tenn. 1975); see also Cohen, supra § 4.04[8].  Even if the challenged evidence is relevant to an issue other than character, it must be excluded if the danger of unfair prejudice outweighs the probative value of the other crime evidence.  State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993); see also State v. Zagorski, 701 S.W.2d 808 (Tenn. 1985); State v. Taylor,

669 S.W.2d 694 (Tenn. Crim. App. 1983). Because the trial court substantially complied with the requirements of Rule 404(b), this court will review the trial court's determination for an abuse of discretion. See DuBose, 953 S.W.2d at 652.

After a jury-out hearing at which the state presented the testimony of Ms. Jordan, the trial court ruled that the testimony was admissible, stating as follows:

> From the evidence that I've heard, I think it's admissible. . . . [T]he material issue exists of whether or not the [d]efendant killed the victim. And it's not an issue of whether he was a usual drug user, it's not talking about a character trait. And the statement is . . . very brief and general; but when looked at in the context of what's been going on, sometime within the last eight days, at most, there has been a homicide and [the defendant] is a suspect . . . . And in that context he announces out of the clear blue that he shot up fourteen times and then [Ms. Jordan] says, "Is that how that happened?" There's no other talk about car wrecks or falling down the steps as you were coming up on the deck, or any other thing. And it seems to me that the thing that's in the foremost in that group of persons' minds would be the fact that he's a suspect in a murder investigation. And when she says, ["I]s that how that happened[,"] and he said[, "Y]es,["] I think the relevance is substantial enough. And I don't think the testimony about shooting up fourteen times is unfairly prejudicial in that context.

In our view, the trial court did not abuse its discretion by admitting the testimony of Deanna Jordan. The defendant's statements to his father and Ms. Jordan would have been admissible under Tennessee Rule of Evidence 803(1.2), which provides that statements by a party-opponent are not excluded by the hearsay rule. The testimony was relevant under Rule 402 to the defendant's identity as the perpetrator of the offense. Although the defendant made no reference to the killing of the victim, the conversation's proximity in time to the murder in conjunction with the investigation of the defendant as a suspect, would give rise to a legitimate inference of connection. The trial court properly ruled that the topic of the conversation would have been appropriate for cross-examination. Whether it qualified as incriminating was a jury question. The value of the testimony rather than its admissibility was the real issue. See State v. Robert D. Walsh, No. W1999-01473-CCA-R3-CD (Tenn. Crim. App., at Jackson, Jan. 30, 2001) (stating that the "extent to which [the victim's] testimony was ambiguous is relevant to the weight to be afforded her testimony, not its admissibility"). Additionally, the "other bad act" evidence, the use of illegal drugs, bore no similarity to the charged offense. It consisted of one statement. Under these circumstances, the probative value of Ms. Jordan's testimony was not outweighed by the danger of unfair prejudice.

### III

The defendant next contends that the trial court erred by precluding him from questioning Detective Scott Carpenter regarding his interview of an individual named Debbie Morales. Ms.

Morales claimed that an individual named "Carlos" had killed the victim. The state asserts that the evidence was properly excluded as unreliable hearsay.

In a jury-out hearing, the defense sought permission to cross-examine Detective Carpenter regarding a statement made by Ms. Morales in June of 1998. According to the defendant's brief, "[Ms.] Morales informed Detective Carpenter that her nephew had told her that a Hispanic male named Carlos Rivera had killed [the victim]." At trial, defense counsel contended that because the state had failed to disclose the statement until August 2002, approximately two months before trial, the defense had been unable to locate Ms. Morales or her nephew to testify at trial.

The trial court held that the testimony consisted of multiple layers of hearsay that were not subject to any exceptions and, therefore, inadmissible:

> Detective Carpenter, I don't think, can testify, under any Rules of Evidence, what Ms. Morales told him that her nephew had told her that was told to the nephew by somebody else. . . . There's . . . no fact that I've heard that gives any indicia of reliability to Ms. Morales. The reliability is all with the statement made to the nephew. And her statement to Detective Carpenter doesn't qualify, and particularly in light of the fact that any – the indication is a lack of reliability because she wouldn't be forthcoming with her information. She's someone who's trying to hide things instead of being open and honest about it.
>
> &ast; &ast; &ast;
>
> But the fact that what this third person said is important, or would be, doesn't create an exception to allow Detective Carpenter to testify about what somebody else told him that somebody else had told them that had been said by some other person. I think I got the right number of people in there.

On appeal, the defendant does not contest the trial court's hearsay determination, but contends that due process requires the admission of Ms. Morales's statements to Detective Carpenter. Under the Due Process Clause of the Fourteenth Amendment, criminal defendants must be afforded a meaningful opportunity to present a complete defense. California v. Trombetta, 467 U.S. 479 (1984). In State v. Brown, which concerned the application of Tennessee's rape shield law, our supreme court stated as follows:

> The constitutional right to present a defense has been held to "trump" the rule against hearsay in at least two United States Supreme Court decisions. . . .
>
> The facts of each case must be considered carefully to determine whether the constitutional right to present a defense has been violated by the exclusion of evidence. Generally, the analysis should consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important. . . .

29 S.W.3d 427, 433 (Tenn. 2000) (citations and footnotes omitted).

Initially, it is not entirely clear exactly what testimony the defendant claims should have been admitted. No offer of proof was made. Although the transcript reflects some discussion of a statement made to police by Ms. Morales, there is no indication whether it was written or otherwise recorded. Likewise, the investigation notes prepared by Detective Carpenter, while apparently submitted as an exhibit at the motion hearing, do not appear in the record. It is the duty of the appellant to prepare a complete and accurate record on appeal. Tenn. R. App. P. 24(b); see also Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997). Nevertheless, based on the record before us, it is our view that the trial court did not err by limiting the defendant's cross-examination of the detective. The evidence bears little, if any, indicia of reliability. Detective Carpenter stated as follows:

> The only time I talked to [Ms. Morales] was that one phone call. During that conversation, . . . she didn't want to give me the nephew's name. I asked her to give me more information, tell me how to get ahold of the nephew. She danced around that. Just ended up refusing to give me the nephew's name. . . . [T]hat's when she started telling me about how she had had an affair with Carlos and her husband was jealous of him and her husband couldn't find out any of this stuff . . . .

Detective Carpenter was unable to substantiate the lead provided by Ms. Morales. She refused to identify her nephew and, even if she had, he was not the source of the information linking Carlos Rivera to the crime. The Hispanic male who reportedly made the allegation was never identified and never interviewed. Because Ms. Morales exhibited some ill will towards Rivera because of a prior relationship, that further discredited the information. In our view, the trial court did not err by limiting reference to the statement.

IV

The defendant also claims that the trial court erred by denying his request for a continuance of the trial date to seek expert assistance in analyzing and rebutting the state's DNA analysis results. The state contends that there was no error.

The record indicates that the defendant sought a continuance the first morning of trial, October 14, 2002, arguing that although the state had had nearly four and one-half years to perform DNA testing, it did not do so until just before the trial. According to defense counsel, the state had initially informed him that the results of the DNA testing performed on the victim's fingernail clippings were "inconclusive." In a final report dated September 27, some seventeen days before the trial date, the state's expert "rechecked" the fingernail clippings and concluded that the defendant could not be excluded as a contributor to DNA found under the nails of the victim's right-hand index and ring fingers. Defense counsel asked for a continuance to retain its own DNA expert and test the remaining unchecked fingernail scrapings "to find out if someone else's DNA could have been involved." In the alternative, the defense asked that the state's DNA evidence be excluded. The state acknowledged that it had initially sent the victim's fingernail scrapings to the TBI which reported that the scrapings were "overwhelmed by the fingernails of the [victim]" and that "[t]hey couldn't

find anything." Later, just before trial, the state sent the samples to LabCorp and "just kind of miraculously they found the [d]efendant's . . . DNA." The assistant district attorney general opposed exclusion of the evidence, arguing, "That guts the case if the DNA under her fingernails is suppressed."

Because the trial had been continued from August and then September to October, the trial court denied the continuance:

> We've been talking about lab results and getting stuff tested since back in August. I am going to order that the samples that were not tested be maintained and if [the defendant] is convicted of anything and the [d]efense wants to have them tested, they can. And if it shows anything that might have impacted the jury verdict, then I guess I'll be granting new trials and we'll be doing it over. But I don't know that it will, and I'm not going to stop at this point.
> If I had been asked on the 23rd of September, or whatever day it was, to extend the trial for a few weeks, I probably would have. But I'm not going to right now.

At the hearing on his motion for new trial, the defendant presented the testimony of Martin M. Shapiro, a psychology professor and statistician at Emory University. Shapiro criticized the conclusion of the state's expert as to the presence of the defendant's DNA under the fingernails on the victim's right hand, explaining that "that sample . . . generates a result at a locus called FGA that, in fact, is not consistent with a mixture of the victim and the [d]efendant." He testified that at FGA, the victim had a 21 and a 25, while the defendant has a 23 and a 26; the test results, however, revealed only the presence of a 21, 25, and 23. According to Shapiro, the state's expert assumed that the 26 was present but undetected. He related, however, that the same results would be reached if the donor were a homozygote, an individual with two 23's at that marker. Shapiro testified that because of the missing allele assumption, the state's "calculations make it appear that the probability of a coincidental match is grossly more rare than it really is."

The grant or denial of a continuance motion rests within the sound discretion of the trial court. Its determination will not be overturned unless there is a clear showing of abuse of that discretion. Woods v. State, 552 S.W.2d 782 (Tenn. Crim. App. 1977); Frazier v. State, 3 Tenn. Crim. App. 696, 466 S.W.2d 535 (1970). When there has been lack of diligence or neglect on the part of the moving party, the motion for continuance should be overruled. State v. Jefferson, 529 S.W.2d 674 (Tenn. 1975). A reversal is warranted only when the failure to continue results in an unfair trial and a different result "might reasonably have been reached had there been a different disposition of the application for a continuance." Baxter v. State, 503 S.W.2d 226, 230 (Tenn. Crim. App. 1973).

For some reason not included in the record, the state delayed further DNA testing until less than three weeks before the trial. To further complicate the issue, the defense waited until the morning of trial to seek a continuance. The trial had just been continued in August and September.

-14-

The defense contends that it needed additional time to test the victim's unchecked fingernail scrapings for the presence of DNA donated by other individuals. It presented no evidence at the motion for new trial of the results of any such additional testing and how those results would have benefitted the defense. Likewise, the testimony of Megan Clement that the fingernail scrapings of the victim's right hand contained a mixture of DNA "consistent" with that of the victim and the defendant is not contradicted by the testimony of Shapiro at the hearing on the motion for new trial. Although Shapiro indicated that the likelihood that the defendant was the donor would have been diminished in the case of a homozygous donor, no statistical evidence was actually presented by the state at trial. It is our interpretation that the evidence would not have been particularly helpful to the defense. In our view, the trial court did not abuse its discretion.

V

Finally, the defendant requests that this court review his sentence under Blakely v. Washington, 524 U.S. ___, 124 S. Ct. 2351 (2004). The minimum sentence for second degree murder is twenty years. The trial court imposed a twenty-three-year sentence based on the following enhancement factors: (2) that the defendant has a history of prior convictions or criminal behavior in addition to those necessary to establish the appropriate range; and (10) that a deadly weapon was used upon the victim. See Tenn. Code Ann. § 40-35-114(2), (10). In mitigation, the trial court found that the defendant had cooperated with the police. See Tenn. Code Ann. § 40-35-113(10). The state asserts that the issue is waived. The defendant argues that the trial court had no authority to enhance the sentence beyond the midpoint of twenty years without the intervention of a jury.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597, 600 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

In calculating the sentence for a Class A felony conviction, such as second degree murder, the presumptive sentence is the midpoint within the range if there are no enhancement or mitigating

factors. Tenn. Code Ann. § 40-35-210(c). If there are enhancement factors but no mitigating factors, the trial court shall set the sentence at or above the midpoint. Tenn. Code Ann. § 40-35-210(d). If there are mitigating factors but no enhancement factors, the trial court shall set the sentence at or below the midpoint. Id. A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. § 40-35-210(e). The sentence should then be reduced within the range by any weight assigned to the mitigating factors present. Id. A Range I sentence for a Class A felony is conviction is fifteen to twenty-five years. Tenn. Code Ann. § 39-13-210; 40-35-112(a)(1).

The state asserts that the defendant has waived his Blakely claim by failing to raise it in the trial court. Previously, in State v. Chester Wayne Walters, No. M2003-03019-CCA-R3-CD, slip op. at 21 (Tenn. Crim. App., at Nashville, Oct. 4, 2004, as corrected Dec. 10, 2004), this court rejected the state's position. Recently, however, in State v. Edwin Gomez and Jonathan S. Londono, No. M2002-01209-SC-R11-CD, slip op. at 17 (Tenn. April 15, 2005), a majority of our supreme court held that where a defendant has failed to properly raise and preserve a Blakely challenge, he is limited to seeking relief via plain error review.

Moreover, prior to the majority's decision in Gomez, this court had observed that the United States Supreme Court's opinion in Blakely called into question the continuing validity of our current sentencing scheme. In that case, the Court, applying the rule in Apprendi v. New Jersey, 566 U.S. 466, 490 (2000), struck down a provision of the Washington sentencing guidelines that permitted a trial judge to impose an "exceptional sentence" upon the finding of certain statutorily enumerated enhancement factors. The Court observed that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Id. at 2537. Finally, the Court concluded that "every defendant has a right to insist that the prosecutor prove to a jury [beyond a reasonable doubt] all facts legally essential to the punishment." Id. at 2543. The Gomez majority, however, concluded that "[u]nlike the statutes at issue in Blakely and Booker, a judicial finding of an enhancement factor in Tennessee does not affect the range of punishment to which a defendant is exposed." Gomez and Londono, slip op. at 25. The defendant makes no other charge of error with regard to sentencing.

Accordingly, the judgment of the trial court is affirmed.

_____
GARY R. WADE, PRESIDING JUDGE